**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAMON IBARRA,** | ) | |
| **Plaintiff,** | ) | **Judge Blanche M. Manning** |
| | ) | |
| **v.** | ) | **Case No. 04 C 8076** |
| | ) | |
| **OFFICE OF THE CHIEF JUDGE** | ) | |
| **OF THE CIRCUIT COURT OF COOK** | ) | |
| **COUNTY,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Ramon Ibarra has filed an action under Title VII, 42 U.S.C. § 2000e et seq.,

against the Office of the Chief Judge of the Circuit Court of Cook County. Ibarra claims that the

defendant discriminated against him on the basis of his national origin when it imposed certain

disciplinary measures after his arrest for driving under the influence. The defendant has moved

for summary judgment. For the reasons stated below, the motion [#43-1] is granted.

**I.      Facts**

      **A.      Department Disciplinary Policies and Procedures**

Ibarra is an Hispanic male. Veronica Ballard was employed by the defendant as chief

probation officer from September 1999 to August 1, 2005. Donna Vaughan has been employed

by the adult probation department since 1987 and is currently the director of human resources for

the adult probation department. One of Vaughan's duties as director of human resources was to

maintain disciplinary records of employees, including Ibarra. She also has imposed discipline on

offending probation officers. According to Vaughan, the adult probation department strictly

follows the collective bargaining agreement ("CBA") when disciplining its employees. The CBA

loosely lays out what types of things for which probation officers can be disciplined.

The adult probation department policy 02.20.01-.05 is entitled Corrective Actions Plan (Disciplinary Procedures) which generally outlines options to correct unacceptable conduct and infraction, but does not outline all potential violations. Other than for verbal reprimands, the Chief Judge is the person who ultimately imposes discipline after a recommendation from the chief probation officer. The recommendations are prepared by Vaughan as the director of human resources at the direction of the chief probation officer.

Vaughan was involved in updating the policy governing disciplinary procedures ("Policy"), which states what are considered to be major cause infractions. With respect to major cause infractions, the Policy states in part:

> Disciplinary action for major cause infraction need not be progressive. Major cause is defined as, but not limited to, the following behavior by an employee on duty or on the premises of any county facility:
>
> 1. Use, possession of, or being under the influence of alcohol, controlled substances or unprescribed drugs;
>
> 2. Fighting;
>
> 3. Employee or visitor abuse;
>
> 4. Unauthorized use of weapons;
>
> 5. Willful destruction of property;
>
> 6. Gross insubordination;
>
> 7. Theft of employee or county property;
>
> 8. Negligence in performance of duties;
>
> 9. Misuse of timekeeping facilities or records;

10.      Absence for three (3) consecutive workdays without notifying the immediate supervisor or chief judge's designee; and

11.      Conviction of a county or municipal ordinance violation; state or federal misdemeanor, felony or plea of nolo contendere, regardless of whether on duty or on the premises of any county facility.

During her deposition, Vaughan testified that discipline may be imposed through the general code of conduct in any number of circumstances including errors in judgment, misconduct, policy violations, ethical issues, embarrassment to the court or for some things that reflect on the integrity of the court because of the position of public trust. According to Vaughan, not everything that may require discipline could be found in a policy and good judgment and common sense must prevail because the defendant is in a position of public trust.

The Policy authorizes the use of temporary suspensions when criminal charges are pending against an employee.

B.      <u>Ibarra's Employment and Discipline History</u>

Ibarra was hired by the defendant to work in its Cook County adult probation department in December 1989 as a probation officer in the Home Confinement division. Vaughan made the recommendation to hire Ibarra. Probation officers must take a written and oral test to earn a promotion. Ibarra has sought and been denied a promotion on three occasions prior to his arrest, which is described below. On at least one of these occasions, Ibarra met the criteria to merit a promotion. Ibarra has not submitted himself for promotion since his arrest.

In or around 1995, Ibarra was transferred from Home Confinement to the Intensive Probation Services ("IPS") division, which is apparently a weapon-carrying unit. Ibarra considers the IPS to be a more prestigious assignment than the Caseload division because

members of the IPS have more responsibility, can direct their own schedules, and generally have more freedom.[1]

In January 2003, Ibarra was arrested for the misdemeanor traffic offense of driving under the influence after he struck a parked vehicle. The owner of the vehicle contacted the police who, upon arrival at the scene, smelled alcohol on Ibarra's breath and subjected him to a Breathalyzer test. The test indicated that Ibarra's blood alcohol level was .2, which was in excess of the legal intoxication limit of .08. Ibarra is subject to performance appraisals by his supervisor and has received numerous honors and commendations in his role as a probation officer. Prior to the DUI incident, Ibarra's appraisal scores were consistently above average. Ibarra testified that after the DUI incident, his scores have fallen noticeably, but fails to cite to any record evidence in support of this testimony. Ibarra also testified that he was told by his supervisor, Vince Curry, that due to the incident, it was impossible for Ibarra to attain a high appraisal score and receive "merit pay." The defendant objects to this last statement on the ground that it is hearsay. The objection is overruled on the ground that the statement is not hearsay because it is an admission of a party-opponent under FRE 801(d)(2).

Ibarra complied with departmental policy by timely reporting his arrest to the adult probation department. Several days after his arrest, on or about February 4, 2003, Ibarra received written notice from Ballard that he was being placed on temporary suspension pending the outcome of his case. Ballard knows of no document authorizing her to place Ibarra on temporary suspension. Ibarra filed a grievance for the purpose of contesting the suspension.

---

[1]The defendant's motion to strike this statement of fact as unsupported is denied. Ibarra's testimony is what his *perception* is–something of which he has personal knowledge. It is not intended as a statement of absolute fact.

Ibarra returned to work on February 21, 2003. Ibarra's criminal record did not reveal any other involvement with the criminal justice system of which the department was not aware nor did his personnel file indicate that he had received any other discipline. Vaughan participated in a discussion about allowing Ibarra to return to an armed position when he had criminal charges pending against him. Ibarra returned to the same position but with restricted duties, which provided that he could not drive a car, could not do field work, could not possess a weapon, and could not have any additional cases pending with DUI charges involved.

On March 27, 2003, Ibarra pled guilty to the DUI charge and was fined and sentenced to 18 months of court supervision. The policy and procedures manual for the adult probation department contains no specific policy regarding court supervision. While defendant asserts that, as a result of the guilty plea, Ibarra was no longer authorized to carry a weapon, Ibarra testified in his deposition that on July 3, 2003, he obtained an order from the criminal court allowing him to carry his weapon. On August 18, 2003, Ballard advised Ibarra in writing that the final ruling on his suspension was for a 15-day suspension of which 12 had already been served. On August 28, 2003, Ibarra received written notice from Vaughan indicating that he was being required to take a psychological evaluation on September 4, 2003. At that time, the authority to send Ibarra for a psychological evaluation stemmed from the CBA, which states that the employer has the authority to direct its business operations and determine qualifications.

Vaughan testified in her deposition that it has always been the practice of the defendant to require an officer that has left the weapons carrying unit to submit to a psychological reevaluation because it is required for initial placement into the weapons-carrying unit. Ibarra points to Vaughan's other testimony that Eric Krystiniak, a white member of the weapon-

carrying unit, was suspended from the weapon-carrying unit for his involvement in a road rage incident in which he brandished his service weapon, but was not required to undergo any reevaluation upon his return to the unit. However, an arbitrator ordered the defendant to allow Krystiniak to return to his post without any conditions.

Vaughan testified in her deposition that Ibarra had a Diagnostic and Statistical Manual IV diagnosis from his initial psychological examination stating that he was "high risk," which led the defendant to believe that in order to safeguard Ibarra and itself it was necessary for Ibarra to be reevaluated. The initial evaluation also indicated that he was making good progress and had a good prognosis. Ibarra's circumstances of a DSM-IV diagnosis arising from a court-ordered assessment were unique in that such circumstances had not been encountered by that department before.

Vaughan also testified that it was management's belief at the time that Ibarra was ordered to submit to a reevaluation that the CBA allowed for the reevaluation. Later, in December 2003 or 2004, the defendant and Ibarra's union entered into a memorandum of understanding which memorialized the defendant's right to seek psychological reevaluation. In any event, Ibarra submitted himself to the reevaluation as required; however, the results were inconclusive and Vaughan advised Ibarra that he would have to submit to another reevaluation. Ibarra complied and sat for a second reevaluation on or about September 11, 2003. Ibarra then filed a grievance regarding the reevaluation's fairness.

On or about November 6, 2003, Ibarra was advised by Vaughan that he no longer met the qualifying criteria for a position in the IPS unit because he had failed the psychological reexamination. Effective November 10, 2003, Ibarra was involuntarily transferred to the

Caseload division, which is not a weapon-carrying unit, because the adult probation department deemed him no longer qualified to remain in an armed position.

However, as described in section F. below, Ibarra's grievances regarding his treatment subsequent to the arrest were submitted to an arbitrator and were ultimately settled pursuant to a Settlement Agreement. The Settlement Agreement provided that Ibarra undergo another psychological reevaluation, which he apparently passed as it appears that he has now returned to an armed position.

Ibarra does not believe that his relationship with coworkers and supervisors was hindered as a result of the incident at issue and Ibarra was generally perceived to be a good employee.

C.     Goldstein's Psychological Examinations

Diane Goldstein, the psychologist at the Isaac Ray Center who frequently assesses probation officers, personally reports her assessments to Vaughan. Goldstein told Vaughan that Ibarra was less than forthright with her during her reassessment of him. Other employees have voiced criticism of Goldstein's assessments.

D.     Ballard's Alleged Prejudice

Ballard, chief probation officer, has received criticism from probation officers concerning her perceived prejudice against Hispanics. For example, on May 16, 2003, during a meeting with several probation officers, Ballard made comments regarding how easy it is for Mexicans to cross the "Chihuahua River," which she subsequently clarified as the Rio Grande River. According to Ballard's deposition testimony, she overheard a probation officer who was at the meeting state that she was offended by Ballard's comment about "walking in the river." When Ballard approached her, the probation officer told Ballard that she was offended because she

personally had crossed the river from Mexico into Texas with her mother and sisters. Ballard then stated to the officer that she had not used the term "walking in the river" in a derogatory way but to "show the closeness of the border" because she had previously worked in Texas.

Ibarra also contends that Ballard is aware that another probation officer heard her use the term "wetback." The deposition testimony cited to by Ibarra, however, does not support this contention. Moreover, Ibarra has only provided deposition excerpts so the court cannot determine whether other pages of Ballard's testimony support this statement of fact. Accordingly, the court will not consider this statement of fact in its consideration of this motion.

On May 30, 2003, a letter was sent to The Honorable Timothy Evans, Chief Judge of the Circuit Court of Cook County, which was signed by approximately 41 employees of the adult probation department. The letter expresses concerns with Ballard's remarks at the May meeting, including a response to a question as to the number of bilingual individuals being hired into the new class of probation officers, to wit: "Unfortunately we don't have enough qualified Hispanic people applying for this position. It is more difficult to get Hispanics in the Chicagoland area, where as Texas, they get uneducated people crossing the river on a daily basis." The defendant contends that this letter is inadmissible as hearsay.

This situation is actually one of hearsay within hearsay – Ballard's alleged statement as set forth in the letter from the probation officers. Fed. R. Evid. 805 states that hearsay within hearsay "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

The letter itself is not hearsay if it qualifies as an admission of a party opponent under FRE 801(d)(2)(D), which provides that a statement is not hearsay if "[t]he statement is offered

against a party and is ··· a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." "The Rule simply requires that the statement be made by an individual who is an agent, that the statement be made during the period of the agency, and that the matter be within the subject matter of the agency." *Young v. James Green Management, Inc.*, 327 F.3d 616, 622 (7th Cir. 2003)(citation omitted).

The signatories of the letter clearly made the statements in the letter during the existence of their employment relationship with the defendant. However, the question is whether the statements were made within the scope of the signatories' employment. The Seventh Circuit has held that in the employment discrimination context:

> the declarant must be involved in the decisionmaking process affecting the employment action involved (i.e., the declarant must be in management or in the company personnel function) in order for his statements to qualify as having been made within the scope of his employment.

*Aliotta v. National Railroad Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003)(*citing Williams v. Pharmacia, Inc*., 137 F.3d 944, 950-51 (7th Cir. 1998).

Here, there is no evidence that the signatories of the letter were involved in the decisionmaking process regarding Ibarra's suspension. Accordingly, it does not appear that the letter qualifies as an admission of a party-opponent and should therefore be excluded as hearsay. Given that the letter itself should be excluded as hearsay, the court need not analyze whether Ballard's statement as described in the letter is hearsay.

Nonetheless, even if the court considers the comment in the context of Ibarra's discrimination claim, the court concludes that Ibarra does not survive summary judgment for the

reasons stated below.

E.     Disciplinary Actions Against Other Employees

Mike Payne, an African-American IPS officer, was arrested for misdemeanor DUI in December 2005. As a result, Payne was issued a temporary suspension and, upon his return, placed on restricted duty without weapon-carrying privileges. Payne was subsequently found guilty of the DUI and sentenced to court supervision. Payne was also suspended for 15 days and required to undergo a psychological reevaluation to return to the weapon-carrying unit.

As already noted, Eric Krystiniak, a white intensive probations services officer, was arrested for a road rage incident in which he brandished a weapon, went to trial and received a sentence of supervision. Vaughan testified that she was unsure whether Krystiniak was suspended for the full period of his case's pendency. He was terminated as a result of the road rage incident, but an arbitrator reversed the termination and ordered Krystiniak back to work without attaching any conditions, including submission to a psychological reevaluation.

Ibarra is not aware of any other IPS officers who were arrested and charged with misdemeanors over the past five years.

Lincoln Smith, an African-American male officer in the Intensive Drug unit, was terminated after committing misdemeanor criminal trespass to property after being found in a "drug house" with some suspicious individuals.

Kevin Coughlin, a white Home Confinement unit officer, was arrested for DUI and received a 12-day temporary suspension. He was brought back to work on restricted duties until his case was resolved because it was determined that, like Ibarra, his presence in the work place would not hinder operations. Coughlin was allowed to carry his weapon while on restricted duty.

Mr. Strolczyk, a white probation officer in a non-weapon-carrying unit, was the mayor of Summit, Illinois and was involved in two DUIs. Strolczyk resigned with a disciplinary action pending. Michael Bingham had his firearms privileges revoked and was removed from the Home Confinement unit as a result of complaints against him and for urinating on a probationer's lawn in front of his partner while on duty. Bingham has not been subjected to a psychological reevaluation because he did not request to return to a weapon-carrying unit.

Kim Flanagan, an African-American female weapon-carrying unit officer was not disciplined but was transferred out of a weapon-carrying unit due to her failure to meet qualification with her weapon as annually required. Flanagan had to submit herself for psychological evaluation in order to requalify and return to the weapon-carrying unit.

Theresa Gorecki was a white female officer in either the Caseload or Court Liaison units, which were not weapon-carrying units. Gorecki was arrested for DUI and sentenced to court supervision. She was not suspended while her case was pending because she was arrested and sentenced while on a leave of absence. She did not report her DUI charge or sentence to the department. Rather, the defendant learned of the DUI arrest and supervision when sheriffs sought to arrest her for a violation of supervision during her leave of absence. The adult probation department was prepared to discharge Gorecki, but agreed to a "last chance" agreement and a suspension of four to five months. Gorecki was not required to undergo a psychological evaluation upon her return because she was not a member of a weapon-carrying unit. She resigned soon after being placed on temporary suspension.

Joe Camarillo, an Hispanic officer, was terminated after being sentenced to felony probation for a DUI and failing to advise the adult probation department of that fact. He had

prior DUI arrests.

Ibarra further agreed during his deposition that the employees mentioned during his deposition, Krystiniak, Coughlin, Flanagan and Bingham, are either white or African-American and have received different levels of serious discipline.

F.     Arbitration and Subsequent Settlement Agreement

Ibarra admits that the grievances underlying this lawsuit were submitted to binding arbitration between the defendant, Ibarra, and Ibarra's union. The issues were not arbitrated because the parties reached a settlement, which called for among other things, a reduction in Ibarra's suspension from 15 to 12 days, recovery of lost pay differential, the ability to resubmit himself for psychological evaluation and his return to a weapon-carrying position upon passing the psychological evaluation.

The Settlement Agreement and Release of Claims entered into by the parties and Ibarra's union required Ibarra to submit to a psychological exam as a condition for reentry into a weapon-carrying unit. In the Settlement Agreement, the defendant agreed to afford Ibarra an opportunity to submit himself to a reevaluation on or before December 30, 2004. However, the defendant did not afford Ibarra such an opportunity until the spring of 2005. Prior to entering into the Settlement Agreement, Ibarra had failed two psychological evaluations to which he was required to submit. As noted above, although not entirely clear from the parties' statements of fact, it appears that Ibarra satisfactorily passed a psychological reevaluation he underwent pursuant to the Settlement Agreement and is now back in a weapon-carrying unit given Vaughan's testimony that in the year since Ibarra's return to an armed position, she has had no reason to question his fitness for the position.

Ballard and Vaughan testified that as long as a decade ago (apparently before he arrived at the adult probation department in December 1989), Ibarra was disciplined for a major infraction, but neither testified as to the specific infraction or the discipline he received as a result.

## II.    Summary Judgment Standard

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322-23. This court must evaluate the evidence supporting the summary judgment motion in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Analysis

### A.    Framework

Under Title VII it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Ibarra is claiming that he was discriminated against because of his national origin, Hispanic.

An employee alleging discrimination may prove discrimination under two methods: (1) "direct method;" or (2) "indirect" or McDonnell-Douglas burden-shifting approach. *Timmons v. General Motors Corp.,* --- F.3d ----, 2006 WL 3512462, at * 4 (7th Cir. Dec. 7, 2006).

Under the "direct" method, a party can rely on either direct or circumstantial evidence to prove his claim. *Id.* "To prove discrimination via direct evidence 'essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.'" *Jordan v. City of Gary,* 396 F.3d 825, 832 (7th Cir. 2005)(citation omitted). Because such direct evidence is often difficult to come by, "a plaintiff may also 'prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Id.* (citations omitted). "Nonetheless, under the direct method, circumstantial evidence 'must point directly to a discriminatory reason for the employer's action.'" *Id.* (citations omitted).

Under the indirect method, Ibarra "must demonstrate that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated others not in his protected class received more favorable treatment." *Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 643 (7th Cir. 2006). If the plaintiff proves his prima facie case, then "it is incumbent upon the defendants . . . to counter with a legitimate, nondiscriminatory and nonpretextual reason for the employment action." *Jordan,* 396 F.3d at 833. As in any Title VII action, the ultimate burden of persuasion

remains on the plaintiff to show that the employer intentionally discriminated against him. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

Ibarra seeks to rely on both the direct and indirect method of proof in order to demonstrate that he was punished more severely for his off-duty DUI than his non-Hispanic counterparts. Specifically, according to Ibarra, he encountered harsher punishment than non-Hispanic probation officers who were charged with misdemeanors because his punishment included: (1) submitting to three psychological evaluations; (2) losing merit pay; (3) receiving low appraisals; and (4) receiving a longer suspension. The court will address Ibarra's discrimination claim under both the direct and indirect methods of proof.

      1.    *Direct Method*

          a.    Direct evidence

Direct evidence is evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or assumption." *Randle v. LaSalle Telecommunications, Inc*., 876 F.3d 563, 569 (7th Cir. 1989). Ibarra contends that Ballard's comments regarding "walking in the river," Mexicans as being uneducated and that it is easy for them to "cross the Chihuahua River" sufficiently establish direct proof of discriminatory intent. These statements, however, if believed, still require an inference to get to the ultimate conclusion that Ibarra was treated differently than non-Hispanic employees because of a forbidden animus. Thus, they fail to provide direct evidence of discrimination. *Hemsworth v. Quotesmith.Com, Inc*., --- F.3d ----, 2007 WL 416984, at *3 (7th Cir. Feb. 8, 2007)("In applying the direct method of proof, we note that there is no admission from Quotesmith that it terminated Hemsworth because of his age and therefore we must determine whether Hemsworth has provided sufficient

circumstantial evidence in the record to demonstrate a genuine issue of material fact."); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)(direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus").

        b.     Circumstantial evidence

The Seventh Circuit has identified three types of circumstantial evidence a plaintiff could introduce to avoid the burden-shifting method introduced in *McDonnell Douglas*:

> The first consists of suspicious timing, ambiguous statements, oral or written, behavior directed toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn···· Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff ··· received systematically better treatment···· And third is evidence that the plaintiff was qualified for the job in question but ···· [was] replaced by a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, or a mere pretext for discrimination.

*Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

As recently stated by the Seventh Circuit:

> evidence of this sort need not necessarily take the form of a convincingly rich mosaic; it is enough that *the circumstances give rise to a reasonable and straightforward inference that the employer has relied on a proscribed factor in taking action against the employee.*

*Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1053 (7th Cir. 2006)(citations omitted)(emphasis added).

Here, Ibarra complains that he was treated differently than other non-Hispanic probation officers after being charged with a DUI because: (1) he believes he received lower appraisals than non-Hispanic employees and was told by his supervisor, Vince Curry, that he could no longer receive merit pay as a result of the DUI arrest; (2) he had to submit to three psychological

examinations; and (3) he received a longer suspension than others for the DUI arrest.

As for the first two allegations of discriminatory treatment, the lower appraisals and the statement that he could no longer receive merit pay, the court finds that no circumstantial evidence supports an inference of intentional discrimination. According to Ibarra, the defendant's discriminatory animus is demonstrated by Ballard's derogatory comments about Hispanics. However, Ibarra has failed to set forth any connection between his purported lower appraisal scores as given by his supervisor, Curry, and the alleged derogatory comments by Ballard. The same is true of Ibarra's contention that he was treated differently when Curry told him that he could no longer receive merit pay as a result of his arrest. Not only has Ibarra failed to demonstrate that he in fact no longer receives merit pay, but he also has failed to connect Ballard's purported derogatory comments to the statement about merit pay by Curry. Accordingly, the purported lower appraisal scores and Curry's statement that Ibarra could no longer receive merit pay as a basis for his national origin discrimination claim do not create a triable issue of material fact as to whether Ibarra was the victim of discrimination.

Regarding the psychological reevaluations and the longer suspension, Ibarra asserts that Ballard's disparaging remarks provide a convincing mosaic of circumstantial evidence that he was treated differently than other non-Hispanics who were arrested for a DUI. "Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision." *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004).

Here, again, the only adverse employment action that the evidence shows Ballard was tied

to was the 15-day suspension.  No record evidence indicates that Ballard had any input into the decisions to require Ibarra to sit for an initial reevaluation after the arrest or submit to a second psychological reevaluation after the initial reevaluation results proved inconclusive.  Therefore, to the extent that Ibarra's national origin discrimination claim is based on his allegation that he was required to sit for more psychological reevaluations than non-Hispanics, Ibarra fails to create a genuine issue of material fact warranting trial.

As for the 15-day suspension, the evidence shows that Ballard is the person who sent the original letter on February 4, 2003, seven days after Ibarra's arrest, informing Ibarra that he was being placed on temporary suspension pending the outcome of his DUI case, and the August 18, 2003, letter advising Ibarra that the final ruling on his suspension was 15 days, of which 12 had already been served.   Ballard's alleged discriminatory comments were made at a meeting on May 16, 2003.  Both parties agree that if Ballard was not the ultimate decisionmaker as to the discipline that was imposed, she had some say regarding disciplinary measures that were inflicted on employees.

"The less direct the connection between the comment and the employment action-that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action-the less evidentiary value the comment will have." *Schuster v. Lucent Technologies, Inc*., 327 F.3d 569, 576 (7th Cir. 2003).  Here, Ballard's alleged comments were not made that close in time to the adverse employment action--the imposition of a 15-day suspension, which was made on August 18, 2003, occurred three months after the alleged discriminatory remarks.  The temporal distance between the discipline and the alleged comments fails to create a genuine issue of material fact that the basis for Ibarra's length of

suspension was discriminatory. *Cf. id.* ("Tatelman's references to 25-year-old employees came about one month after Schuster's termination"). *See also Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998) (finding that a comment made five months prior to employee's termination was not temporally related to the discharge decision); *Wichmann v. Bd. of Trustees of S. Ill. Univ.*, 180 F.3d 791, 801-02 (7th Cir. 1999) (finding that a comment made one month after an employment action was temporally related because it was meant to explain that action, but noting that a "seemingly stray workplace remark" may provide evidence of discrimination only if the remark is "related to the employment decision in question"), *vacated on other grounds, Bd. of Trustees of S. Ill. Univ. v. Wichmann*, 528 U.S. 1111, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000).

In addition, there is no indication that the disparaging remarks by Ballard were related to the decision to impose a 15-day (versus a 12-day) suspension. *Scaife v. Cook County* 446 F.3d 735, 741 (7th Cir. 2006)("When a plaintiff offers an employer's stray remark in a discrimination case, it is necessary to demonstrate 'some nexus' between the remark and the challenged employment decision.")(citation omitted). *See also Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) ("[Derogatory] comments cannot defeat summary judgment in favor of an employer unless they are both proximate and related to the employment decision in question."); *Bannon v. The University of Chicago*, No. 04 C 3081, 2006 WL 1722374, at *6 (N.D. Ill. June 16, 2006)("four isolated comments, made in a context unrelated to any discussion of a promotion, are insufficient to survive summary judgment").[2]

---

[2]The court finds Ibarra's citation to *Waite v. Board of Trustees of Illinois Comm. College Dist. No. 508*, 408 F.3d 339 (7th Cir. 2005) inapposite. In that case, the Seventh Circuit, while stating that "this is not the strongest case we have seen," concluded that supervisor's statement

Accordingly, the court finds that the alleged derogatory comments by Ballard are not sufficient circumstantial evidence from which a reasonable jury could infer discriminatory intent because they do not "point directly to a discriminatory reason for the employer's action." *Jordan*, 396 F.3d at 832 (citation omitted).

## 2.    *Indirect (McDonnell-Douglas) Method*

The defendant has conceded for purposes of this motion that Ibarra meets the first three elements of his prima facie case; however, the defendant contends that Ibarra cannot show that similarly situated employees outside the protected class were treated more favorably.

As recently noted by the Seventh Circuit, the "similarly situated requirement '*normally* entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007)(citations omitted)(emphasis in original). In determining whether a certain employee is similarly situated to other employees, the court should consider whether the employees possess analogous attributes, experience, education, and qualifications and are in materially parallel positions. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). A plaintiff need not show

---

that the terminated plaintiff displayed a "plantation mentality" was sufficient evidence to support the jury's verdict that the plaintiff was discriminated against based on her national origin, which was Jamaican. *Id*. at 344-45. In that case, the supervisor made the comment that the plaintiff had a "plantation mentality" in the context of the plaintiff's job performance and testified that "one of the reasons she recommended that Waite be disciplined was because she was outraged that Waite would ask her to finalize the contract." *Id*. at 344. Here, however, no evidence supporting a connection between Ballard's random disparaging comments and the decision to impose a 15-day suspension has been evinced.

"complete identity," only substantial similarity. *Id*. at 618. Thus, the critical inquiry is whether "there [are] enough common features between the individuals to allow a meaningful comparison." *Humphries*, 474 F.3d at 405 ("Put a different way, the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.").

Significantly, while Ibarra names several individuals who were probation officers and who were charged with either DUIs or other crimes, he fails to set forth any evidence that these individuals were similarly situated with respect to position, experience, education, performance and/or qualifications. The following individuals were discussed in the statements of fact: Mike Payne, Eric Krystiniak, Lincoln Smith, Kevin Coughlin, Mr. Strolczyk, Michael Bingham, Kim Flanagan, Theresa Gorecki, and Joe Camarillo.

These individuals, however, are not similarly situated. As to Strolczyk, Ibarra himself concedes that Strolczyk is not similarly situated. According to the statement of facts, Bingham was in a different unit (Home Confinement not IPS, as was Ibarra–though both were apparently weapon-carrying) and it does not appear that he was charged with any crime. Further, he was not subjected to a psychological reevaluation because he had not requested to return to a weapon-carrying unit. Flanagan, whose exact unit is not stated, was apparently transferred out of a weapon-carrying unit not because of the conviction of a crime but because she failed to pass a qualifying test with her weapon.

Camarillo, an Hispanic officer whose unit and other characteristics relevant to the similarly-situated inquiry were not specified, was terminated after being arrested for felony DUI.

Camarillo is not outside the protected class, was treated worse than Ibarra, and had other DUI arrests prior to the one for which he was terminated. Smith, an African-American male, was not convicted of DUI and was in a different unit (the Intensive Drug unit not IPS) from Ibarra. Further, Krystiniak, a white IPS officer, was not charged with DUI and moreover, was actually terminated for his road rage incident but was ordered to return to work by an arbitrator with no requirement for a psychological reevaluation. Thus, these men were not similarly situated to Ibarra.

Gorecki, a female probation officer, was in a different unit than Ibarra, which was not weapon-carrying, and she therefore was not required to undergo a psychological reevaluation prior to her return. Payne, an African-American IPS officer, was also arrested for misdemeanor DUI, was temporarily suspended for the same number of days as Ibarra, was placed on restricted duty without weapon-carrying privileges, and was required to undergo a psychological reevaluation prior to his return to the weapon-carrying unit. Thus, he was not treated any differently than Ibarra.

Finally, Coughlin, a white probation officer, was arrested for DUI. There is some conflicting testimony regarding his suspension period and whether he was required to submit to a psychological reevaluation prior to returning to a weapon-carrying unit. According to the testimony of Vaughan, the director of human resources for the adult probation department, Coughlin was temporarily suspended for 12 days and was required to submit to psychological reevaluation. However, Ibarra testified in his deposition that Coughlin received a 10-day suspension and was not required to submit to a psychological reevaluation. Ibarra fails to point to any foundation for his knowledge of Coughlin's discipline; accordingly, the court deems

Ibarra's testimony as to Coughlin's discipline inadmissible.

Vaughan, however, by virtue of her position, maintained the discipline records for employees and thus was aware of disciplinary measures imposed on the department's employees. Therefore, based on Vaughan's testimony, the only difference between the discipline imposed on Coughlin and Ibarra is that Coughlin received a 12-day suspension versus Ibarra's 15-day suspension. However, Ibarra has failed to show that he and Coughlin are similarly situated. Ibarra admits that Coughlin was a member of the Home Confinement unit, not IPS, and he further fails to identify whether Coughlin was similar in terms of his performance, background, and supervisor. Thus, there is not sufficient evidence for the court to find enough common factors between Coughlin and Ibarra to conclude that they are similarly situated for purposes of this analysis.

In sum, the court in no way condones the insensitive comments allegedly made by Ballard. Nevertheless, because none of the proffered employees are similarly situated as set forth under the above-described Seventh Circuit precedent, (in other words, similar enough to Ibarra to allow for a meaningful comparison between their treatment), Ibarra has failed to meet the fourth prong of the prima facie test. *Radue,* 219 F.3d at 617-18 (showing of similarly situated "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

**IV.    Conclusion**

For the reasons stated herein, the defendant's motion for summary judgment [#43-1] is granted.  The clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket.

**DATE:**    March 19, 2007

_Blanche M. Manning_
**Blanche M. Manning**
**United States District Judge**